**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| USA STAFFING SOLUTIONS,<br><br>                        Plaintiff,<br>   -against-<br><br>GE GRID SOLUTIONS LLC,<br><br>                        Defendant. | Case No. _____<br><br>Jury Trial Demanded |

## COMPLAINT

Plaintiff USA Staffing Solutions ("Plaintiff"), by and through its attorneys, The Postlethwaite Law Firm PLLC, as and for its Complaint against Defendant GE Grid Solutions LLC ("GE") (collectively with Plaintiff, the "Parties"), alleges as follows:

## NATURE OF THE ACTION

1. This is an action for anticipatory breach of contract arising from GE's ill-conceived bid to avoid its contractual obligation to pay for temporary labor and recruitment services provided by Plaintiff at GE's manufacturing facility located in Charleroi, Pennsylvania (the "Charleroi Location").

2. The terms and conditions governing the Parties' business relationship are memorialized in a Master Services Agreement ("MSA") and Statement of Work ("SOW") (collectively, the "Agreement"), dated November 1, 2021 (Exhibit A).

3. Plaintiff fully performed under the Agreement.

4.      When it came time for GE to pay for the services Plaintiff rendered, however, GE deployed a "bait-and-switch" scheme to avoid its obligation to compensate Plaintiff as mandated by the Agreement.

5.      As set forth below, GE's knowing and intentional violation of its contractual obligations has caused and continues to cause Plaintiff to suffer significant monetary damages.

6.      Plaintiff brings this action seeking not less than $750,000.00 in contractual damages and other relief.

## THE PARTIES

7.      Plaintiff USA Staffing Solutions is a Pennsylvania limited liability company with its principal place of business located at 2090 Greentree Rd., Suite 220, Pittsburgh, Pennsylvania 15220.

8.      Defendant GE Grid Solutions, LLC is a Delaware limited liability company with its principal place of business located at 4200 Wildwood Parkway, Building 2018, Atlanta, Georgia 30339.  GE Grid Solutions, LLC may be served through its registered agent The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

## JURISDICTION AND VENUE

9.      This is a civil action over which this Court has jurisdiction under the provisions of 28 U.S.C. § 1332 because Plaintiff is completely diverse from the Defendants and the amount in controversy exceeds $75,000.00.

10.     Further, under Section 13.2 of the MSA (the "Governing Law and Venue Clause"), incorporated into the SOW by Section 1 thereof, the Parties expressly agreed to initiate

litigation only in the United States District Court for the Southern District of New York or, if such Court lacks subject matter jurisdiction, in the Supreme Court of the State of New York. *See* MSA, § 13.2.

11. Venue is also proper in this Court pursuant to the Governing Law and Venue Clause and pursuant to 28 U.S.C. § 1391(b)(3), as the Parties have agreed to submit to the personal jurisdiction of this Court and have waived any defenses regarding venue or forum non conveniens. *See* MSA, § 13.2.

## FACTUAL ALLEGATIONS

**A. Background**

12. GE owns and operates a circuit breaker and instrument transformer manufacturing plant located in Charleroi, Pennsylvania.

13. With the exception of certain management personnel who were directly employed by GE, most of the workers operating the Charleroi Location were sourced through third party staffing agencies, including Plaintiff.

14. Plaintiff is engaged in the business of providing executive search, remote staffing, and temporary and permanent employment solutions for its clients.

15. Plaintiff sources, recruits, and onboards candidates through nationwide campaigns, community outreach, and job fairs. These recruitment efforts target potential candidates who possess the relevant experience, skillset, and work history to satisfy each client's unique staffing requirements and expectations.

16. Under the Agreement, GE outsourced the entirety of the staffing process to Plaintiff to fulfill GE's significant headcount needs at the Charleroi Location.

17. Per the terms of the Agreement, Plaintiff sourced and recruited individuals who possessed the skills and talents to meet GE's personnel requirements at the Charleroi Location. A candidate that successfully passed the relevant background and screening processes was then hired by Plaintiff and became Plaintiff's employee. Plaintiff, as employer, was responsible for paying that employee's salary, providing benefits and health insurance, and maintaining a workers' compensation insurance policy should that employee suffer an injury at that employee's assigned place of work – in this case, at the Charleroi Location.

**B. The Agreement**

18. On November 1, 2021, Plaintiff and GE entered into the Agreement with an effective date of November 15, 2021.

19. Pursuant to the Agreement, GE engaged Plaintiff to provide a temporary workforce comprised of Plaintiff's employees to work at the Charleroi Location. Employees that worked at the Charleroi Location for six months were then eligible to be "converted" – that is, hired directly by GE as a fulltime GE employee. If GE wanted to convert one of Plaintiff's employees prior to the six month eligibility threshold, GE would pay a "conversion fee" to Plaintiff. *See* SOW, § 5.

20. Under the Agreement, Plaintiff was responsible for providing its own supervisory personnel tasked with liaising between the employees comprising the temporary workforce and the GE Human Resources team overseeing operations at the Charleroi Location; onboarding new employees and assisting with scheduling, payroll, and training; and performing all hiring, interviewing, background screening, and drug testing processes.

21. As for GE's obligations under the Agreement, GE was responsible for providing equipment and onsite resources for use by Plaintiff's employees assigned to work at the Charleroi Location.

22. As GE's projected headcount requirements at the Charleroi Location fluctuated, Plaintiff modified its recruitment campaign targets so that Plaintiff could match GE's anticipated near-term and long-term workforce needs.

23. Although Plaintiff's employees worked at the Charleroi Location, which upon information and belief was owned and operated by GE at all relevant times, those employees – absent resignation or termination – remained employed by Plaintiff unless and until those employees were converted and directly hired by GE.

C. The Agreement's Compensation Structure – Markup and Conversion

24. Under the Agreement, in exchange for Plaintiff's services, GE compensated Plaintiff pursuant to a markup and conversion fee structure outlined in Section 5 – Fees and Pricing of the SOW. *See* SOW, § 5.

25. Plaintiff employed and directly paid the salaries of its employees working at the Charleroi Location. At predetermined intervals as provided in the Agreement, Plaintiff prepared and provided to GE an invoice reflecting the hours worked and wages paid by Plaintiff to its employees working at the Charleroi Location with an agreed-upon markup percentage of forty-one and a half percent (41.5%). *See* SOW, § 5.

26. This payment structure incentivized Plaintiff to source and hire well-qualified individuals suited to the requirements set by GE for its manufacturing operations at the Charleroi Location. With less employee turnover, and with each employee continuing to work at the

Charleroi Location for at least six months prior to conversion, Plaintiff would earn the markup fee applicable to a given employee for the target six-month duration.

27. According to the Agreement, after six months, GE would convert Plaintiff's employees working at the Charleroi Location to become a fulltime GE employee. Upon conversion, the employer and employee relationship with Plaintiff would cease and the subject employee would become a fulltime GE employee.

28. Upon conversion, GE was obligated to compensate Plaintiff according to the conversion fee payment schedule outlined in Section 5 – Fees and Pricing of the SOW. *See* SOW, § 5.

29. The conversion fee payment structure incentivized GE to make fulltime hiring decisions promptly and convert employees before the mandated six-month conversion point. Although an "early" conversion required GE to pay Plaintiff a conversion fee, once an employee became a fulltime GE employee, the markup fee payable to Plaintiff stopped.

30. The applicable conversion fee was scaled to reflect the incentives built into the Agreement – a quick conversion resulted in a higher conversion fee payable to Plaintiff (as Plaintiff would no longer be able to charge the markup fee into the future for such an employee), while a delayed, full six-month term conversion resulted in a lower conversion fee.

31. The conversion fee payable to Plaintiff by GE was calculated as a percentage of the employee's gross annual salary as of the date of conversion. An early conversion at two months, for example, resulted in a twenty-five percent (25%) conversion fee payable to Plaintiff. *See* SOW, § 5.

**D. Agreement Term and Termination Provisions**

32. The term of the Agreement began November 15, 2021 (the "Effective Date") and ended on November 1, 2024, subject to renewal by mutual written consent by the Parties (the "Term"). *See* MSA, § 17.2.

33. The Parties could terminate the Agreement prior to the end of the Term by: i) the Parties' mutual written consent; ii) at GE's convenience at any time through written notice to Plaintiff specifying the extent of termination and effective date of termination; iii) by GE through written notice to Plaintiff in the event of Plaintiff's insolvency; or iv) by GE through written notice to Plaintiff specifying Plaintiff's default. *See* MSA, § 17.1 – 17.5.

34. The exercise by GE of any of its termination rights required that GE first provide Plaintiff with written notice of its intention to terminate the Agreement in accordance with the notice provision. *See* MSA, § 21.

35. Should GE terminate the Agreement for any reason other than Plaintiff's insolvency or Plaintiff's breach, GE was required to pay all fees and costs incurred by Plaintiff through the date of termination and negotiate "reasonable termination costs" identified by Plaintiff "which shall be paid to [Plaintiff]." *See* MSA, § 17.3.

36. The Agreement further provided that, upon termination, GE was obligated to reimburse Plaintiff for the cost of all work performed under the Agreement before the date of receipt of the termination notice, including a *pro rata* portion of Plaintiff's profit. *See* MSA, § 17.7(b).

**E. Plaintiff and GE Negotiate Renewal and Extension of the Agreement**

37. In May 2024, Plaintiff and GE began negotiating the renewal of the Agreement.

38. At GE's request, Plaintiff generated a proposal and circulated that written proposal to GE on May 29, 2024.

7

39. In the leadup to the renewal negotiation, GE leadership communicated to Plaintiff its desire to phase out contingent and temporary labor and instead concentrate exclusively on direct hiring, *i.e.*, utilizing Plaintiff's services to source, evaluate, and present to GE a pool of qualified candidates from which GE would directly hire as its own fulltime employees.

40. On June 5, 2024, however, GE informed Plaintiff that GE would not be extending or renewing the Agreement after expiration of the Term.

41. Instead, GE intended to bring on an "additional supplier" at some unspecified date. Nevertheless, GE reiterated its expectation that Plaintiff would continue to work diligently in accordance with Plaintiff's duties under the Agreement throughout the entirety of the remainder of the Term.

42. Thereafter, on or about June 26, 2024, GE requested Plaintiff to provide a list of Plaintiff's employees currently working at the Charleroi Location along with their respective hire dates, the length of time each employee had been working at the Charleroi Location, and the conversion fee percentages applicable to each employee based upon their tenure as part of the Charleroi workforce.

43. GE also requested that Plaintiff provide a calculation of Plaintiff's costs incurred for each listed employee, including recruitment, background check, drug screening, and other expenses for which Plaintiff was responsible pursuant to the Agreement.

44. Plaintiff provided all requested information and reminded GE that per the Agreement, GE was still obligated to pay both the ongoing markup fees and the conversion fees for employees converted prior to the end of the Term.

45. GE confirmed receipt of the requested information on July 10, 2024. In confirming receipt of that information, GE further informed Plaintiff that GE leadership would

use the employee list and fee data to decide whether or not to bring on an additional supplier prior to the expiration of the Term.

**F. Unbeknownst to Plaintiff, GE Had No Intention to Renew the Agreement Or Continue Performing Through the End of the Term**

46.     On July 11, 2024, Plaintiff received a letter from non-party Aerotek, Inc. – a contingent labor force supplier and direct competitor of Plaintiff.

47.     According to Aerotek's letter, Aerotek recently signed a preferred supplier agreement with GE for contingent labor staffing needs and, effective July 15, 2024 – only four days after the letter was received by Plaintiff – Aerotek personnel would appear at the Charleroi Location to conduct an introductory information session with all of Plaintiff's employees about their imminent "transition" to becoming employed by Aerotek.

48.     Unbeknownst to Plaintiff, however, as of late June 2024, GE had already entered into an agreement with Aerotek to replace Plaintiff for all of GE's contingent and temporary staffing needs at the Charleroi Location.

49.     In fact, GE and Aerotek had already scheduled an on-site meeting with all of Plaintiff's employees working at the Charleroi Location to be held on July 8, 2024, during which Aerotek would inform Plaintiff's employees that they could choose to work for Aerotek or resign.

50.     After receiving this letter on July 11, 2024, Plaintiff reached out to GE for an explanation.

51.     In response, GE stated that the purpose of the Aerotek letter was to inform Plaintiff, as GE's current supplier, that all of Plaintiff's employees currently working at the Charleroi Location would be transitioned over to Aerotek and, should any employee refuse to be

switched over to this new supplier, that employee would be terminated from continuing to work at the Charleroi Location.

**G. GE Failed to Provide Plaintiff With Notice as Required by the Agreement**

52. At no point in time prior to Plaintiff's receipt of Aerotek's letter did GE inform Plaintiff that GE intended to terminate the Agreement prior to the end of the Term.

53. Just one day prior to receipt of the Aerotek letter, Plaintiff and GE were actively negotiating renewal of the Agreement to better align their business relationship to reflect GE's goal to eliminate contingent and temporary staffing services and focus on direct hiring.

54. Bizarrely, and in total contradiction to the representations and statements made by GE throughout these negotiations with Plaintiff, GE now apparently planned on using Aerotek – instead of Plaintiff – for contingent and temporary staffing services.

55. By replacing Plaintiff with Aerotek prior to the end of the Term, GE unequivocally acted in a way inconsistent with its duties and obligations under the Agreement.

56. GE had also plainly violated the notice provisions contained in the Agreement. *See* MSA, § 21.

57. GE had not provided any written notice to Plaintiff complaining of any default or breach purportedly committed by Plaintiff in accordance with Section 17.5 of the MSA, nor had GE provided any written notice to Plaintiff specifying the extent of GE's termination for convenience and the effective date thereof in accordance with Section 17.3 of the MSA.

58. Plaintiff had not ceased its operations nor had any proceeding under applicable bankruptcy or insolvency laws been initiated against or by Plaintiff permitting termination of the Agreement by GE due to Plaintiff's insolvency in accordance with Section 17.4 of the MSA.

59. Neither GE nor Plaintiff expressed a desire to terminate the Agreement in the form of a mutual, written consent executed by the Parties in accordance with Section 17.2 of the MSA.

60. GE did not provide Plaintiff any notice – written or otherwise – terminating the Agreement prior to the end of the Term.

61. Despite GE's conduct, which was plainly inconsistent with its continuing duties and obligations under the Agreement, the Agreement had not been properly terminated by GE and therefore, GE remained contractually bound to continue to perform under the Agreement until the end of the Term.

**H. Plaintiff Objects to GE's Conduct and Demands Continued Performance Under the Agreement**

62. Plaintiff objected in writing to GE's decision to replace Plaintiff with Aerotek prior to the end of the Term.

63. On July 18, 2024, Plaintiff asked GE to explain why it hired Aerotek to provide contingent labor staffing services when, only one month prior, GE expressly informed Plaintiff that GE was phasing out contingent labor to concentrate exclusively on direct hiring.

64. GE, however, then suddenly adopted the surprising and incongruous position that GE had, in fact, properly terminated the Agreement prior to replacing Plaintiff with Aerotek.

65. In response, Plaintiff rejected the notion that GE had terminated the Agreement, urged GE to recognize the absurdity of the reasoning GE offered to justify the switch to Aerotek, and demanded that GE continue to perform under the Agreement throughout the end of the Term, including adhering to those contractual provisions that obligated GE to negotiate and pay to Plaintiff reasonable termination costs and reimburse Plaintiff for the cost of all work performed

under the Agreement, including a *pro rata* portion of Plaintiff's profit. *See* MSA, §§ 17.3; 17.7(b).

66. GE, however, balked at the idea that it should be responsible for continuing to perform under the Agreement through the end of the Term or that it should be responsible for Plaintiff's reasonable costs, reimbursements, or a *pro rata* portion of Plaintiff's projected profit that would otherwise be due and owing to Plaintiff over the remaining months in the Term.

67. GE intentionally failed to address the glaring issue at hand – that by switching Plaintiff's employees over to Aerotek with five months remaining in the Term or by refusing to pay Plaintiff the applicable conversion fees for each such employee, GE had robbed Plaintiff of its contractually bargained-for consideration in the form of the equivalent of five months' worth of employee markup fees or, in the alternative, the employee conversion fees for all employees being switched over to Aerotek.

68. Despite failing to terminate the Agreement in accordance with its notice provisions, GE nevertheless continued to maintain the position that not only had the Agreement been properly terminated, but that GE had absolutely no obligation to pay Plaintiff for its costs, reimbursements, or *pro rata* portion of its profits through the end of the Term.

69. Eventually, GE let slip its motivation for bringing in Aerotek before the end of the Term. On July 24, 2024, GE informed Plaintiff that, in fact, it had never been GE leadership's intent to move towards a direct hiring process in lieu of temporary staffing, nor did GE ever intend to pay Plaintiff conversion fees for the employees being transitioned over to Aerotek.

70. Put differently, it became clear to Plaintiff that GE was simply trying to have its cake and eat it too – keep the already vetted and capable employees working at the Charleroi

Location but transition them to a new supplier before they reached the requisite tenure triggering GE's obligation to pay conversion fees to Plaintiff.

### I. GE's Violation of the Agreement was Substantial and Undermined the Entire Contractual Relationship

71. GE engaged in a course of conduct entirely at odds with its duties and obligations under the Agreement.

72. In direct violation of its contractual obligation to convert Plaintiff's employees into fulltime GE employees and pay the requisite conversion fees, GE took action entirely at odds with its obligation to convert Plaintiff's employees and remit to Plaintiff the applicable conversion fees.

73. The conduct at odds with GE's obligation to convert and remit the applicable conversion fees includes GE's refusal to pay said conversion fees contemporaneous with GE's substitution of Plaintiff for Aerotek as exclusive provider of all temporary and permanent labor at the Charleroi Location, despite Plaintiff's demand for payment.

74. In direction violation of its contractual obligation to pay to Plaintiff the applicable markup fees associated with the provision of its employees for GE's benefit at the Charleroi Location, GE took action entirely at odds with its obligation to pay to Plaintiff the applicable markup fees.

75. The conduct at odds with GE's obligation to pay to Plaintiff the applicable markup fees associated with the provision of its employees for GE's benefit at the Charleroi Location includes GE's refusal to permit any of Plaintiff's employees to continue to work at the Charleroi Location unless all such employees resigned from continued employment with Plaintiff and entered into an employee and employer relationship with Aerotek, despite Plaintiff's demand that Plaintiff be compensated for the forced transition of its own employees.

**J. After Brazenly Violating the Agreement, GE Refuses to Honor Its Contractual Duty to Negotiate Plaintiff's Reasonable Costs**

76. By refusing to pay to Plaintiff the applicable conversion fees upon transitioning its employees over to Aerotek, and refusing to pay to Plaintiff the applicable markup fees for the remainder of the Term by prohibiting Plaintiff's employees from continuing to work at the Charleroi Location, GE evinced an unequivocal intention to stop performing under the Agreement.

77. Plaintiff did not assent to GE's refusal to continue to perform its contractual obligations under the Agreement.

78. Instead, Plaintiff strongly objected to GE's refusal to continue to perform under the Agreement.

79. Plaintiff repeatedly demanded that GE pay the conversion fees and markup fees applicable to Plaintiff's employees currently staffed at the Charleroi Location both prior to the Aerotek transition date and thereafter.

80. GE, however, dragged its feet in responding to Plaintiff's demand for performance under the Agreement and refused to provide any information to Plaintiff regarding the transition itself, such that Plaintiff was rendered unable to inform its employees of the imminent changes which would cause material changes to the payroll, supervisory, and employment structures already in place since the inception of the Agreement.

81. In early August 2024, Plaintiff began receiving telephone calls, emails, and text messages from its employees working at the Charleroi Location.

82. According to multiple employees, on August 5, 2024, GE personnel had announced that the Aerotek onboarding process would begin imminently for those employees who wish to remain working at the Charleroi Location; that all such transitioned employees

would be required to utilize Aerotek's time entry portal going forward; and that Plaintiff was no longer associated in any capacity with the Charleroi Location or with GE.

83. One such employee recounted to Plaintiff that, on or about August 5, 2024, GE and Aerotek personnel announced to all then-present employees that Aerotek had come in as the new temporary labor agency because Plaintiff had "pulled out" from its contract with GE.

84. Plaintiff incurred significant and unexpected costs and expenses arising from the chaotic transition of its employees over to Aerotek.

85. Under the Agreement, GE was obligated to negotiate and reimburse Plaintiff for such costs and expenses and, further, to pay to Plaintiff a *pro rata* portion of its profits through the end of the Term.

86. Plaintiff compiled a summary, with supporting documentation and calculations, of its costs, expenses, reimbursements, lost profits, and other information.

87. As mandated by the Agreement, on or about September 3, 2024, Plaintiff provided all such information to GE pursuant to Section 17 of the MSA and demanded that GE observe its contractual obligation to negotiate payment of such costs, expenses, reimbursements, and lost profits. *See* MSA, §§ 17.3; 17.7(b).

88. Weeks passed without GE acknowledging receipt of the demand despite Plaintiff consistently following up for a response.

89. Ultimately, on October 1, 2024, GE rejected all of Plaintiff's claims and refused to negotiate on the grounds that GE and Plaintiff had previously mutually agreed to transition all of Plaintiff's employees to Aerotek.

**COUNT I**
**(Anticipatory Breach of Contract)**

90. The Agreement is a valid and enforceable contract between Plaintiff and GE.

91. Plaintiff fully performed under the Agreement and performed all acts on its part to be performed under the Agreement, including rendering services to and for the benefit of GE.

92. GE's statements and conduct unequivocally repudiated GE's obligations to perform under the Agreement, such statements and conduct constituting an anticipatory breach of contract.

93. Had GE fully performed in accordance with its contractual obligations, Plaintiff would have obtained the benefit of its contractual bargain in the form of the markup fees associated with the provision of its employees for GE's benefit at the Charleroi Location and in the form of the conversion fees associated with the six-month conversion timeline as provided in the Agreement.

94. Further, had GE fully performed in accordance with its contractual obligations, Plaintiff would have obtained the benefit of its contractual bargain in the form of reasonable termination costs, reimbursement of expenses and costs, and *pro rata* portion of its profits through the end of the Term as provided in the Agreement.

95. At the time of commencement of this action, Defendant GE contends that it owes no obligation to pay to Plaintiff conversion fees, markup fees, reasonable termination costs, reimbursement of expenses and costs, or *pro rata* portion of its profits through the end of the Term.

96. GE's anticipatory breach of contract has caused and continues to cause damage to Plaintiff in an amount to be determined at trial, but which is believed to be no less than Seven Hundred Fifty Thousand Dollars ($750,000.00), plus interest, from the date of breach.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief and judgment as follows:

A. Awarding damages to Plaintiff in an amount to be determined at trial but believed to be no less than Seven Hundred Fifty Thousand Dollars ($750,000.00), plus pre- and post-judgment interest;

B. Awarding Plaintiff the costs, fees, and expenses incurred in this action, including without limitation, reasonable attorneys' fees to the extent permitted by law; and

C. Awarding Plaintiff such other and further relief as the Court may deem just and proper.

Dated: New York, New York
November 1, 2024

Respectfully submitted,

THE POSTLETHWAITE LAW FIRM PLLC

*PJP*
_____
Preston J. Postlethwaite, Esq.
100 Park Avenue, 16th Floor
New York, New York 10017
PJP@postlethwaitelaw.com
(646) 389-3202 (phone)
(646) 619-4733 (fax)
*Attorneys for USA Staffing Solutions*